UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH OF A
BLUE APPLE IPHONE CURRENTLY
LOCATED AT 324 SOUTH RIVER ROAD,
BEDFORD NH

Case No.  24-mj-37-01-AJ

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Matthew Blazon, being sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      This Affidavit is submitted in support of an application under Rule 41 of the
Federal Rules of Criminal Procedure for a search warrant, authorizing the search of a blue Apple
iPhone described and/or pictured in Attachment A, via forensic examination and extraction of
electronically stored information, as described in Attachment B.

2.      I am a police officer employed by the Hudson Police Department in New
Hampshire, and a deputized Task Force Officer ("TFO") to the U.S. Drug Enforcement
Administration ("DEA") in Manchester, New Hampshire District Office.  I am the case officer
with primary responsibility over the investigation herein described.  I have direct and indirect
knowledge of the following facts.

3.      As a TFO to DEA, I am authorized to perform federal law enforcement functions
outlined in 21 U.S.C. § 878(a), pursuant to cooperative enforcement arrangements authorized by
21 U.S.C. § 873(a)(7), including the execution and service of search warrants issued under the
authority of the United States, which encompass the investigation of federal drug and money
laundering violations under Title 21 and Title 18 of the United States Code.  As described later, I
am engaged in the enforcement of federal criminal law, and, thus, I am a "Federal law

enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(c) also authorized to apply for the requested search warrant.

4.      My law enforcement career began in 2015.  I was hired by the Hudson Police Department in 2015 and transferred to the Hudson Police Special Investigations Bureau, Narcotic Investigations Unit, in July 2020.  While there, I conducted investigations into narcotics-related offenses.  I have also served as TFO to DEA Strikeforce in Manchester since March 2022.  I have attended narcotics and criminal investigation training courses administered by the New Hampshire Police Standards and Training Council, DEA, Northeast Counterdrug Training Center, and Hudson Police.

5.      My drug enforcement experience is varied.  I have participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia used in the manufacture and distribution of controlled substances; United States currency; records of narcotics and monetary transactions; drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances; and the collection, expenditure, accounting, transportation, and laundering of drug proceeds.  I have participated in the debriefing of numerous defendants, informants, and witnesses who had personal knowledge regarding large-scale drug trafficking organizations ("DTOs").  I have participated in various aspects of drug investigations, including surveillance, search warrant executions, and arrests.

6.      Through my training, education, and experience, I have gained a nuanced understanding of criminal drug distribution activity.  I have become generally familiar with the way that DTOs conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in

such activities to avoid detection by law enforcement.  Based on my training and experience, I

am familiar with the various methods of operation employed by narcotics traffickers to further

their illicit operations.

7.     I have consulted various sources of information to support my statements in this

Affidavit.  These statements are based on my participation in this investigation, as well as

information I consider reliable from the following sources: my experience investigating drug

trafficking offenses; oral and written reports and documents about this investigation that I have

received from members of the DEA; local law enforcement, and other federal law enforcement

agencies; discussions I have had personally concerning this investigation with other experienced

narcotics investigators; physical surveillance conducted by DEA and local law enforcement

agencies, the results of which have been reported to me either directly or indirectly; public

records and law enforcement databases.

8.     This Affidavit distinguishes between my direct and indirect knowledge of the

matters asserted.  Unless otherwise indicated, the statements contained herein are summaries of

information that I have received from other law enforcement officers, and I specifically relied on

oral reports from other law enforcement officers. When information is based on my personal

knowledge or conclusion, it will be so stated.

9.     This Affidavit is not an exhaustive or comprehensive account of information

gathered during the investigation. As this Affidavit is being submitted for the limited purpose of

establishing probable cause to support the issuance of the requested warrant, I have not included

every detail of every aspect of the investigation that is known to me.  That said, this Affidavit

does contain all the material information known to me that is pertinent to the requested search

warrant, but it does not set forth all my knowledge about this matter.

10.     Based on my training and experience, I submit that the facts contained in this Affidavit establish probable cause to believe that one ANGEL GREGORIO SUAREZ GUERRERO has committed violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of a controlled substance) and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute a controlled substance), and that evidence, fruits, and/or instrumentalities of this violation, will be found within the electronic device(s) herein identified.

## IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED

11.     The property to be searched is a blue Apple iPhone described and/or pictured in Attachment A ("the Device").  The Device is currently located at the DEA's Manchester District Office, 324 South River Road, Bedford, New Hampshire.

12.     The requested warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

13.     The underlying investigation involves voice and text communications between an undercover law enforcement officer (UC) and the user of a cell phone messaging app, who marketed narcotics for sale in New Hampshire over social media platforms in and around July and August 2022.  Through these communications and subsequent UC narcotic purchases, law enforcement believed that the user of the messaging app was a source of narcotic supply, who also utilized a "runner" to complete prearranged narcotic deals with customers from New Hampshire.  During the investigation, law enforcement seized nearly 250 grams total of fentanyl during eight separate UC buys from a "runner" identified during the investigation as ANGEL GREGORIO SUAREZ GUERRERO.  These UC buys occurred from August through November

4

2022, and again in November 2023, and all were prearranged by the supplier over the phone messaging app.

14.     Pertinently, early in the investigation, law enforcement identified the supplier and his cell phone number linked to the messaging app.  Through a court-authorized use of certain investigative tools, investigators observed that the supplier's cell phone had been in frequent contact with cell phone assigned number (978) 983-7251, including in and around the same time of the UC buys.  This led investigators to believe that the 7251 telephone was probably used by SUAREZ GUERRERO to coordinate his narcotic deliveries directly with the supplier.  Likewise, when the supplier's cell phone was in contact with a New Hampshire-based phone number, investigators observed the supplier's cell phone and the 7251 telephone make contact, suggesting similar coordination.

15.     With this information, investigators sought to confirm that the 7251 telephone was used by SUAREZ GUERRERO.  To that end, on October 24, 2022, at approximately 1:10 P.M., law enforcement conducted visual surveillance of a residential building on Spruce Street in Lawrence, Massachusetts, relevant to the investigation.  Surveillance showed SUAREZ GUERRERO exit the front door of the residential building and walk down Spruce Street toward Arlington Street.  As SUAREZ GUERRERO walked down Spruce Street, law enforcement called the 7251 telephone.  As the phone dialed, surveillance showed SUAREZ GUERRERO manipulate items he was holding at the time, reach into his pants pocket, and pull out a cell phone, which he held for a moment while looking down and walking.  SUAREZ GUERRERO subsequently put the phone back into his pants pocket without answering it.  Later, at approximately 1:23 P.M., law enforcement received a phone call from the 7251 telephone, which

they did not answer.  Thus, investigators believed that the 7251 telephone was used by SUAREZ GUERRERO.

16.    On January 31, 2024, SUAREZ GUERRERO was indicted on a federal drug conspiracy charge for his involvement in the prearranged sales of fentanyl to the UC, who posed as a customer from New Hampshire.  In connection with this indictment, on February 14, 2024, law enforcement arrested SUAREZ GUERRERO during a buy-bust operation.

17.    In the days leading up to the February 14, 2024 arrest, I was acting in an undercover capacity and inquiring to purchase more than 400 grams of fentanyl at a certain price from the supplier.  I arranged the deal with the supplier over the same messaging app and cell phone number used in all the prior UC buys.  Earlier on the date of the arrest, February 14, 2024, the supplier directed me to meet with a runner at a convenience store located on Union Street in Lawrence, Massachusetts, to complete the deal.  During this conversation, and at my request to conduct the deal elsewhere, the supplier agreed to conduct the deal at the Walmart in Methuen, Massachusetts.  Prior to my arrival at the agreed-upon meet location, DEA agents and Methuen Police Detectives had set up surveillance in the Walmart area.  I inquired from the supplier if the runner would be the same person I have always dealt with, and he confirmed it would be the same runner from previous deals, referring to SUAREZ GUERRERO.

18.    At approximately 2:30 P.M., I arrived at Walmart and was instructed to meet with the runner inside the store bathroom and conduct the deal.  Members of the surveillance team had identified and confirmed that SUAREZ GUERRERO was inside the store during this time, walking with an unknown Hispanic male.  During the surveillance of SUAREZ GUERRERO in the store during the deal, he was actively using a cell phone frequently while I personally communicated back and forth with the supplier.  Moments later, SUAREZ GUERRERO was

observed exiting the front of the store toward the parking lot. As members of law enforcement approached SUAREZ GUERRERO, he immediately took off running toward Home Depot located nearby within the same shopping plaza.  After a brief foot pursuit, SUAREZ GUERRERO was placed under arrest and taken into custody in connection with the federal indictment.  During a search incident to his arrest, SUAREZ GUERRERO was found to be in possession of more than 400 grams of suspected fentanyl and a quantity of suspected crack cocaine that was located inside of his sweatshirt.  The quantity of suspected fentanyl was consistent with the amount requested and agreed upon with the supplier.

19.     Shortly after, SUAREZ GUERRERO was transported by Methuen Police back to the station for processing. Once back at the station, SUAREZ GUERRERO agreed to speak with investigating agents.  Methuen Police Detective Javier Reyes assisted DEA agents with language translation due to SUAREZ GUERRERO not able to speak English.  Prior to the interview with DEA TFO Ethan Judd and me, Detective Reyes read SUAREZ GUERRERO *Miranda* warnings verbatim from DEA Form 13B, a Spanish language *Miranda* warnings form.  SUAREZ GUERRERO then waived his *Miranda* rights and agreed to speak with TFO Judd and me about the investigation.

20.     During the post-arrest interview, it was evident to me that SUAREZ GUERRERO was not forthcoming with his answers, distancing himself from the situation. For example, SUAREZ GUERRERO stated he was at Walmart on this date because someone had texted him requesting that he deliver a package to someone and accepted the request to deliver the package. SUAREZ GUERRERO said he has no name for the subject he communicates with but the subject calls him by the name, "brother."  When asked about the text messages on his phone with this subject, SUAREZ GUERRERO said the messages sent by the subject were deleted at the

subject's end.  I asked SUAREZ GUERRERO if he would consent to showing us these text messages on his phone, but he refused to do so. SUAREZ GUERRERO did not want agents looking through his blue Apple iPhone. SUAREZ GUERRERO acknowledged that he was involved in the sale of narcotics but could not provide an estimate of how many times he sold drugs. Significantly, SUAREZ GUERRERO provided us with his current phone number (978) 983-7251. This is the same phone number identified as being in frequent contact with the supplier's cell phone, especially during the UC buys in 2022.  This is also the same phone number that I called on October 24, 2022, when I observed SUAREZ GUERRERO take his cell phone out of his pocket and look at it as it rang.  SUAREZ GUERRERO's blue iPhone cell phone was seized as evidence pending the application of a search warrant.

21.    Also, on the date of the arrest and after seizing the SUAREZ-GUERRERO's cell phone, I did observe on the iPhone home screen multiple notifications from messaging apps, including the same app used by the supplier.  The message notifications from this particular app further showed the same user profile image previously observed during communications for the UC deals mentioned earlier.  No content was observed for these notifications as they were simply notifications on the home screen.  I do not have photographs of these notifications and I believe they have since timed out and disappeared.  Thus, I believe that the supplier was attempting to contact SUAREZ-GUERRERO concerning the prearranged UC deal, consistent with the frequent contacts that occurred between them during the UC deals in 2022.

22.    Based on the totality of the circumstances, including SUAREZ GUERRERO's role in the prearranged UC narcotic deals, the frequent contacts between the supplier's cell phone and his 7251 telephone, especially in and around the time of the UC buys in 2022, his admitted narcotic sales and text message communications regarding the delivery of a package on the date

8

of his arrest, and the message notifications believed to be from the supplier, I believe that the 7251 telephone seized from SUAREZ-GUERRERO, which is described and pictured in Attachment A, was used to coordinate and complete narcotic deliveries, in violation of 21 U.S.C. §§ 841 and 846, and contains evidence, fruits, and instrumentalities of those violations.

23.    The Device is currently in the lawful possession of the DEA.  As briefly discussed earlier, the Device came into DEA's possession as items seized during a search incident to a lawful arrest.  Therefore, while the DEA might already have all necessary authority to examine the Device, I request this warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

24.    The Device is currently in storage at the DEA's Manchester District Office, 324 South River Road, Bedford, New Hampshire.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the DEA.

## USE OF ELECTRONICS IN DRUG TRAFFICKING

25.    I know from my training and experience that individuals involved in narcotics trafficking often maintain records linking them to their trafficking activity and their drug trafficking associates.  These records may be stored physically or digitally on computers or other electronic devices or media.  These records may include notes, records or ledgers of narcotics sales, debts owed, past or future shipments, and other records, including telephone records, which identify customers and/or other co-conspirators.  Through my training and experience, I know that such records may be in code and/or may appear as rather innocuous and not particularly incriminating on their face.  Such records are often maintained by drug traffickers

for extended periods of time.  The aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them including on electronic devices.

26.     I know that it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as: currency, financial instruments, precious metals and gemstones, electronics, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers' checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the drug traffickers within locations which they maintain dominion and control over, including electronic devices.

27.     I know that when drug traffickers amass significant proceeds from the sale of drugs, they often attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize, among other mechanisms, domestic and international banks and their attendant accounts, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency. Drug traffickers often commingle narcotics proceeds with money generated by legitimate businesses.  Evidence of these activities are also maintained by drug traffickers within electronic devices.

28.     I know that drug traffickers take or cause to be taken photographs of themselves, their associates, and their property. I know that these traffickers usually maintain these photographs in their possession.  I am also aware that drug traffickers store on electronic devices photos, videos, and other media associated with the sale, purchase, and distribution of illegal drugs.  This media includes photographs and videos of the drugs and other items associated with

their illegal activities to demonstrate their prowess and as an advertisement of their wares. These photos, videos, and other media often establish the identities of the individuals involved in the sale, purchase, and distribution of the illegal drugs.

29.     I know that drug traffickers often use or otherwise store data about importation, transportation, ordering, purchasing, shipping, and distribution of controlled substances on electronic devices. These communications and other records also tend to establish the traffickers' identities. Based on my training and experience, I am aware that drug traffickers often use electronic devices to facilitate the purchase of illegal drugs. These electronic devices often contain financial data relating to the transactions, such as bank account numbers, bank records, credit card numbers, credit card account and account information used for the purchase of illegal drugs, and all identifying information for the same. The communications and other data often also demonstrate the drug trafficker's state of mind.

30.     I know that drug traffickers also use electronic devices for communication or other forms of data storage or sending/receiving relating to bank records, account information, and other electronic financial records ties to the importation, transportation, ordering, purchasing, and distribution of controlled substances.

31.     I know that communication through electronic devices—such as through telephone calls, texts, chat, email, instant messaging, and other applications—enables drug distributors to maintain constant contact with associates, drug suppliers, and customers. I know that it is common for drug traffickers to use these applications to communicate with associates relating to the logistics of their drug trafficking business and store information (purposely or inadvertently) relating to their unlawful activities.

32.     I know that drug traffickers often use cellular and/or portable telephones, smart phones, and other electronic equipment and data storage devices in furtherance of their criminal activities and to maintain contact with associates, drug suppliers and customers.

## TECHNICAL TERMS

33.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.     Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually

be retrieved by connecting the camera to a computer or by connecting the removable

storage medium to a separate reader.  Removable storage media include various types of

flash memory cards or miniature hard drives.  Most digital cameras also include a screen

for viewing the stored images.  This storage media can contain any digital data, including

data unrelated to photographs or videos.

       c.      Portable media player:  A portable media player (or "MP3 Player" or

iPod) is a handheld digital storage device designed primarily to store and play audio,

video, or photographic files.  However, a portable media player can also store other

digital data.  Some portable media players can use removable storage media.  Removable

storage media include various types of flash memory cards or miniature hard drives.  This

removable storage media can also store any digital data.  Depending on the model, a

portable media player may have the ability to store very large amounts of electronic data

and may offer additional features such as a calendar, contact list, clock, or games.

       d.      GPS:  A GPS navigation device uses the Global Positioning System to

display its current location.  It often contains records the locations where it has been.

Some GPS navigation devices can give a user driving or walking directions to another

location.  These devices can contain records of the addresses or locations involved in

such navigation.  The Global Positioning System (generally abbreviated "GPS") consists

of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely

accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation

of the current time, combined with a special sequence of numbers.  These signals are sent

by radio, using specifications that are publicly available.  A GPS antenna on Earth can

receive those signals.  When a GPS antenna receives signals from at least four satellites, a

computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      e.      PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

      f.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      g.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet,

14

connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

34.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at apple.com, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

35.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

36.     Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

37.     Nature of examination.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant.

38.     Manner of execution.  Because this warrant seeks only permission to examine the Device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

### CONCLUSION

39.     Based on my training and experience, I submit that the facts contained in this Affidavit establish probable cause to believe that one ANGEL GREGORIO SUAREZ GUERRERO has committed violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of a controlled substance) and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute a controlled substance), and that evidence, fruits, and/or instrumentalities of this violation, will be found within the electronic device(s) herein identified.  Therefore, I request that the Court issue the requested warrant, authorizing the examination of the Device described in Attachment A to search for and seize the items described in Attachment B, to be executed at any time during the day or night.

Signed under the pains and penalties of perjury this __29th__ day of _____February_____ 2024.

/s/ Matthew Blazon
_____
Detective Matthew Blazon
Task Force Officer
Drug Enforcement Administration

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: __Mar 1, 2024__

Time: __11:54 AM, Mar 1, 2024__

Andrea K. Johnstone   U.S. Magistrate Judge

UNITED STATES MAGISTRATE JUDGE

17

## ATTACHMENT A

1.      The property to be searched is a blue Apple iPhone, unknown model, with

assigned number (978) 983-7251 (herein referred to as the "Device").  Agents are not yet able to

determine the serial number for the Device before the Device remains locked.  The Device is

currently located at 324 South River Road, in Bedford, New Hampshire.  The Device is depicted

in the photos below (front and back).

2.      This warrant authorizes the forensic examination of the Device for the purpose of

identifying the electronically stored information described in Attachment B.

**The Device**
**(Blue Apple iPhone)**

 

## ATTACHMENT B

1.      All records on the Device described in Attachment A that relate to violations of

21 U.S.C. §§ 841(a)(1) (distribution of and possession with intent to distribute controlled

substances) and 846 (conspiracy) and involve ANGEL GREGORIO SUAREZ GUERRERO,

from August 1, 2022 through February 14, 2024, including:

   a.   Information associated with drug trafficking, including pay-owe sheets, buyer or
        customer lists and related identifying information, telephone lists, address books,
        seller lists, ledgers, records of sales, records of expenditures made to purchase
        controlled substances, and records of expenditures to purchase products which are
        used in the distribution of controlled substances;

   b.   texts, phone call records, FaceTime records, voicemails, photographs, videos,
        GPS application data, encrypted application messages, social media applications,
        voice memos, currency exchange applications,

   c.   types, amounts, and prices of drugs trafficked as well as dates, places, and
        amounts of specific transactions;

   d.   any information related to sources of drugs (including names, addresses, phone
        numbers, or any other identifying information);

   e.   any information recording SUAREZ GUERRERO's schedule or travel, from
        August 1, 2022 through February 14, 2024;

   f.   information reflecting contact or communication with coconspirators, the
        distribution of controlled substances to coconspirators, and the disposition of
        proceeds of controlled substances (including within messaging applications like

WhatsApp, Facebook, Snapchat, Telegram, and Instagram stored on the phone); and

g.   all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.